**IN THE DISTRICT COURT OF GUAM**

JOSEPH LAGUANA,

                Plaintiff,

      v.

UNITED AIRLINES, INC.,

                Defendant.

Case No. 1:22-cv-00027

DECISION AND ORDER
GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

## I.  INTRODUCTION

This case involves hostile work environment and discrimination claims by Plaintiff Joseph Laguana ("Laguana") against his former employer Defendant United Airlines, Inc. ("United"). Before the court is United's motion for summary judgment on liability on all counts and damages. (Mot., ECF No. 59.) Laguana filed a response (Opp'n, ECF No. 72), to which United replied (Reply, ECF No. 74). Laguana's complaint alleges four counts: 1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); 2) disability discrimination in violation of Section 503 of the Rehabilitation Act of 1973 ("Section 503"); 3) disability discrimination under Title 22, Section 5203 of the Guam Code ("Section 5203"); and 4) a hostile work environment claim based on "homophobic and insulting comments" directed at him and his disability. (Compl. 6–10, ECF No. 1.) The court held a hearing on United's motion, granting it without objection from Laguana with respect to Counts Two and Three—Laguana's Section 503 disability discrimination claim and Section 5203 disability discrimination claim. (MSJ Mins., ECF No. 84.) The court took United's motion as to the remaining two counts—Laguana's ADA and hostile work environment claims—under advisement. (*Id.*) Having considered the briefs, the applicable law, and counsel's arguments, the court now GRANTS United's motion on Laguana's remaining two counts for the reasons

detailed herein.

## II. FACTUAL BACKGROUND

The facts below are derived from the parties' undisputed facts (United's Stmt., ECF No. 60; Laguana's Opp'n Stmt., ECF No. 73; United's Reply Stmt., ECF No. 75), which are based on numerous declarations and exhibits (ECF Nos. 60-1–60-11, 72-1, 75-1–75-3). To the extent that a fact was not explicitly identified as disputed or undisputed, the court treats the fact as undisputed for the purposes of the motion pursuant to Rule 56(e) of the Federal Rules of Civil Procedure ("FRCP"). Where a part of a fact is disputed, the court notes as such.

### A. Background on Laguana and His Employment with United

Laguana is a former part-time Customer Service Representative for United, where he was responsible for being physically present and assisting customers at the airport ticket counter, baggage area, and airport gates. (Pl. Dep. Tr. 10–13,[1] ECF No. 60-2; Laguana's Opp'n Stmt. ¶¶ 1–2.[2]) Laguana's employment was subject to a collective bargaining agreement between United and his union, the International Association of Machinists and Aerospace Workers ("Union"). (Suarez Decl. 1–2, ECF No. 60-6; Laguana's Opp'n Stmt. ¶ 1.) Laguana alleges he has suffered from asthma since he was around ten years old. (Pl. Dep. Tr. 24–25; Laguana's Opp'n Stmt. ¶ 3.) Prior to the COVID-19 Pandemic in March 2020, Laguana had not taken any extended periods of medical leave of absence. (Pl. Dep. Tr. 17; Laguana's Opp'n Stmt. ¶ 5.) Relatedly, prior to the COVID-19 Pandemic, Laguana's asthma never interfered with his ability to perform his work duties and he had never requested any time off work to address his condition. (Pl. Dep. Tr. 26; United's Reply Stmt. ¶ 3.)

---

[1] For convenience, the court uses the PDF page numbers of the Plaintiff's Deposition Transcript filed at ECF No. 60-2.

[2] The court uses the paragraph symbol (¶) to refer to the fact numbers in United and Laguana's concise statements of facts.

### B. The COVID-19 Pandemic and Laguana's Response

On March 13, 2020, President Donald Trump issued Proclamation 9994, declaring a national emergency in light of the COVID-19 Pandemic.[3] Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020). In or around April 2020, Laguana requested to work remotely, questioned the number of employees at work, and requested to move the location of an operational briefing because he believed the planned location would not allow employees to adequately socially distance themselves. (Walsh Decl. 208–09, 219–20 ECF No. 72-1; United's Reply Stmt. ¶ 4 (undisputed as to Laguana's specific requests).) Laguana was not experiencing asthma or COVID-19 conditions when he requested accommodations, but was trying to avoid contracting COVID-19. (Pl. Dep. Tr. 41–43; United's Reply Stmt. ¶ 8.) On April 8, 2020, Laguana wrote to Dr. Scott Wesley Hughes: "Would it be possible to get my diagnosis of asthma so that I may submit FMLA paperwork about a chronic and existing issue? I would like to utilize some of my qualifying earned hours to excuse myself from work and get paid." (Pl. Dep. Tr. 35–38, 115; Laguana's Opp'n Stmt. ¶ 7 (undisputed that communication occurred).) After Dr. Hughes questioned Laguana about his symptoms, Laguana responded: "I am okay and carefully monitoring my existing asthma conditions . . . I was just looking at different avenues of utilizing my hard earned FMLA hours in light of current [sic] pandemic and lack of consideration by our local management." (Pl. Dep. Tr. 39, 114; Laguana's Opp'n Stmt. ¶ 8 (undisputed that communication occurred).)

On April 18, 2020, Laguana emailed United's Employee Advocacy Director Rahman Henderson regarding the lack of communication about his request to work remotely, his dissatisfaction with United leadership, and his concern that he will be retaliated against. (Walsh

---

[3] Pursuant to Rule 201 of the Federal Rules of Evidence, the court takes judicial notice of this fact.

Decl. 250–52; United's Reply Stmt. ¶ 2 (undisputed that communication occurred).) One month later, on May 18, 2020, Laguana sent Henderson a follow up email, indicating that his General Manager Justin Marion attempted to reach out to him about his concerns but that he has been "respectfully[] declining" and "dodging" those conversations. (Walsh Decl. 253.) In response, Henderson explained that Marion was likely reaching out to help resolve Laguana's concerns and encouraged Laguana to meet with Marion "as soon as possible." (*Id.*)

Also in May 2020, Laguana went on a two-and-a-half-year medical leave of absence that continued until his employment with United ended in November 2022. (Pl. Dep. Tr. 21–22, 31–32; Laguana's Opp'n Stmt. ¶ 6.) When United requested additional medical documentation from Laguana to support his medical leave of absence, Laguana communicated to Dr. Hughes in early July 2020: "I am not comfortable putting myself at risk nor my families risk [sic] by even going to work because of the continued travel of passengers from 'Hotspot' not to mention possible 'epicenters' of COVID19." (Pl. Dep. Tr. 35, 40, 106; Laguana's Opp'n Stmt. ¶ 9 (undisputed that communication occurred).)

## C. United Investigates a Video of Laguana at a Bar

At some point, United became aware of a video depicting Laguana at a bar on June 19, 2020; in the video, Laguana has his mask off, and he is holding an alcoholic beverage while other individuals are also present at the bar. (Pl. Dep. Tr. 47–48; Laguana's Opp'n Stmt. ¶¶ 12–13 (undisputed as to date portrayed in and content of video).) United proceeded to initiate an investigation based on Laguana's presence at the bar, which United believed was inconsistent with Laguana's taking of medical leave. (Pl. Dep. Tr. 48; Laguana's Opp'n Stmt. ¶ 14 (undisputed that United believed behavior was inconsistent).) Laguana's supervisor, Ellie Sandlin, concluded that Laguana abused sick leave and was uncooperative during the investigation in violation of company policies. (Suarez Decl. 2; Ex. D 3, ECF No. 60-7; United's

Reply Stmt. ¶ 12.) On or around October 21, 2020, Hearing Officer Stuart Suarez presided over an "investigative review meeting" regarding Laguana's termination. (Suarez Decl. 1–2; Laguana's Opp'n Stmt. ¶ 16.) Suarez concluded that Lagnaua had violated multiple company policies and that termination of his employment was warranted. (Suarez Decl. 2; Laguana's Opp'n Stmt. ¶ 16.)

### D. United Investigates the WhatsApp Group Chat

Four days after the investigative review meeting was held, on October 25, 2020, the Union alleged that various United employees, including Sandlin, had been involved in a WhatsApp chat group wherein they made offensive remarks about Laguana and other co-workers. (Murdoch Decl. 2, ECF No. 60-10; Laguana's Opp'n Stmt. ¶ 17.) The WhatsApp chat was a United airlines work chat; the chat included supervisors, and topics of discussion included United operations work items in addition to disparaging remarks about other employees and customers. (United Reply Stmt. ¶ 16; *see* Walsh Decl. 5–63.) Sandlin made numerous chat comments, including comments about how she planned to adjust Laguana's schedule because she did not like working with him. (Walsh Decl. 132; United Reply Stmt. ¶ 13 (undisputed as to Sandlin's comments regarding schedule).) In Mina Manibusan's deposition, Manibusan testified that she had made her remarks about Laguana because her relationship with him had worsened, and because Laguana was loud, annoying, and never happy. (Manibusan Dep. Tr. 5[4], ECF No. 60-3; Laguana's Opp'n Stmt. ¶ 48.) Manibusan did not intend for her remarks about Laguana to be shared with him. (Manibusan Dep. Tr. 5; Laguana's Opp'n Stmt. ¶ 48.)

United investigated and substantiated that the employees in the WhatsApp chat had made inappropriate remarks about Laguana and other co-workers. (Murdoch Decl. 2; Laguana Opp'n

---

[4] The court uses the PDF page numbers of Manibusan's Deposition Transcript filed at ECF No. 60-3.

Stmt. ¶ 18 (undisputed that United investigated and substantiated claims).) Based on the investigation's findings, United terminated two supervisors—Sandlin in May 2021 and John Taitague in June 2021. (Marion Decl. 2, ECF No. 60-8; Laguana's Opp'n Stmt. ¶ 19 (undisputed that disciplinary actions were taken).) Further, United issued two termination warnings and reprimanded non-supervisors involved in the WhatsApp chat in August 2021, and rescinded the travel benefits of the former supervisors in the WhatsApp chat in November 2021. (Marion Decl. 2–3; Laguana's Opp'n Stmt ¶ 19 (undisputed that disciplinary actions were taken).) Laguana testified during his deposition that if United had terminated additional "immediate co-workers" based on their involvement in the WhatsApp chat, he could have returned to work and the "medical issue" underlying his leave of absence would have been resolved. (Pl. Dep. Tr. 81–84; Laguana's Opp'n Stmt. ¶ 44.)

In terms of the relationship between the bar video investigation and the WhatsApp chat investigation, United allowed Sandlin to investigate Laguana and relied upon her views regarding Laguana, while another United investigator was investigating Sandlin herself at or around the same time for her disparaging conduct related to the Whatsapp chat. (Walsh Decl. 131; United's Reply Stmt. ¶ 12.) Further, despite the multiple investigations on Guam that involved working with Sandlin, neither investigative team interacted or shared information with each other. (Walsh Decl. 132–34; United's Reply Stmt. ¶ 14.) Lastly, Justin Marion, then General Manager of Airport Operations for Guam Operations, rescinded Hearing Officer Suarez's decision to terminate Laguana's employment despite the evidence of his misconduct involving fraudulent use of sick leave. (Marion Decl. 2; Laguana's Opp'n Stmt. ¶ 20 (undisputed decision to "rescind" termination was in April 2021).)

### E. Laguana Files an Administrative Charge

On February 19, 2022, Laguana filed a charge of discrimination with the Guam Department of Labor. (Pl. Dep. Tr. 94–101; United Reply Stmt. ¶ 19 (undisputed as to February 19, 2022 date).) Laguana's charge, which was also filed with the Equal Employment Opportunity Commission ("EEOC"), did not include any allegations of termination from employment. (Pl. Dep. Tr. 100–01; Laguana's Opp'n Stmt. ¶ 23 (undisputed that charge did not describe termination).) Instead, Laguana referenced three incidents in his charge: 1) "[o]n April 18, 2021, I was harassed on the United Airlines WhatsApp chat regarding homophobic and hostile comments about my disability (Asthma);" 2) "[o]n May 5, 2021, United Airlines informed me via email that they have conducted an investigation which I believe was half hearted and they failed to make any corrections regarding my complaint of harassment;" and 3) "[o]n September 1, 2021, I exhausted all my leave because the company failed to take any action on my complaint and I feel that it remains a hostile work environment." (Pl. Dep. Tr. 100–01; Laguana's Opp'n Stmt. ¶ 23 (undisputed as to three incidents referenced in charge).)

### F. Laguana's Sexual Harassment of Four Female Co-Workers

Starting in May 2022 until approximately August 2022, four female employees reported to United incidents of sexual harassment and violent threats made by Laguana. (Golding Decl. 2–3, ECF No. 60-4; Laguana's Opp'n Stmt. ¶ 25.) United Corporate Security Investigations Manager Matthew Golding investigated the allegations, and found that the allegations against Laguana of six incidents of sexual harassment and violent threats were substantiated. (Golding Decl. 1–3; Laguana's Opp'n Stmt ¶¶ 26 –32.) During his deposition, Laguana admitted that he had engaged in harassing behavior towards his female co-workers and had done so to flirt and solicit sexual encounters with the women because of "manic episodes" involving "increased flirtatiousness and sexual drive." (Pl. Dep. Tr. 63–73; Laguana's Opp'n Stmt. ¶ 34.) One of the

women harassed by Laguana, Mina Manibusan, viewed Laguana's messages as a direct threat against her and her husband. (Manibusan Dep. Tr. 5–6; Laguana's Opp'n Stmt. ¶ 35.) Out of concern for her and her family's safety, Manibusan purchased pepper spray for protection and contacted the Guam Police Department. (Manibusan Dep. Tr. 5–6; Laguana's Opp'n Stmt. ¶ 35.) On November 22, 2022, United terminated Laguana's employment based on the investigation findings related to his sexual harassment. (Marion Decl. 3; Laguana's Opp'n Stmt. ¶ 37.) Laguana testified that he did not resign from United, did not attempt to resign, and was still employed by United when United terminated him. (Pl. Dep. Tr. 23; Laguana's Opp'n Stmt. ¶ 47.) At the time of his termination, Laguana had long exhausted his leave, received no pay, was not going into the workplace, and was on Extended Illness Status (extended leave status). (Pl. Dep. Tr. 31–34; United's Reply Stmt. ¶ 29.)

Before Laguana's termination, in September 2022, the EEOC had dismissed Laguana's charge. (Pl. Dep. Tr. 7–10; Laguana's Opp'n Stmt. ¶ 36 (undisputed as to receipt of EEOC dismissal notice in September 2022).) Laguana did not file a new administrative charge regarding his termination in November 2022. (Pl. Dep. Tr. 6, 21–22; Laguana's Opp'n Stmt. ¶ 37.) However, Laguana proceeded to challenge his November 2022 termination pursuant to his collective bargaining agreement. (Walsh Decl. 279–80; United's Reply Stmt. ¶ 23 (undisputed as to Laguana challenging termination).) Laguana also testified at his deposition that United's termination of his employment in November 2022 for harassing four female co-workers is not part of this instant action. (Pl. Dep. Tr. 86; Laguana's Opp'n Stmt. ¶ 41.) Lastly, Laguana testified during his deposition that he never filed a complaint with the Office of Federal Contract Compliance Programs. (Pl. Dep. Tr. 86; Laguana's Opp'n Stmt. ¶ 38.)

## III.  LEGAL STANDARD

The court shall grant summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) (internal citations omitted). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). "An issue is genuine if a reasonable trier of fact could find in favor of the non-moving party." *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A mere "scintilla of evidence" is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252. A fact is "material" if it could affect the outcome of the case. *Id.* (citing *Anderson*, 477 U.S. at 248). The court views the evidence in the light most favorable to the non-moving

party and draws "all justifiable inferences" in that party's favor. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). However, conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (internal citation omitted).

## IV.    DISCUSSION

Having previously granted United's motion for summary judgment as to Counts Two and Three of Laguana's complaint, the court now addresses United's motion for summary judgment on Laguana's ADA disability discrimination claims (Count One) and hostile work environment claims (Count Four). As for Count One, the court finds that Laguana's disability discrimination claims fail for the following reasons: 1) Laguana's wrongful termination claim fails for lack of administrative exhaustion; 2) Laguana's policy or practice claims fails because the evidence does not demonstrate that United had a policy or practice of creating discriminatory workplace chat groups; 3) Laguana's failure to accommodate claim fails because United granted Laguana's accommodation requests and there is no evidence of failure to implement the accommodations; and 4) Laguana's constructive discharge claim fails because Laguana never resigned. Lastly, Laguana's hostile work environment claims fail because they are untimely. The court addresses each of these claims in turn.

### A.  Summary Judgment on Laguana's Disability Discrimination Claims Under the ADA (Count One) Is Appropriate.

In his complaint, Laguana alleges that United discriminated against him in four different ways: by failing to provide a reasonable accommodation, compelling him to expend leave in order to maintain employment, wrongfully terminating him, and "implementing a policy or practice of creating workplace chat groups that served to discriminate against individuals with disabilities . . . ." (Compl. ¶¶ 37–41.) United argues that Laguana's disability discrimination

claims fail on the merits because Laguana fails to establish a *prima facie* case of disability discrimination under Title I of the ADA. (Mot. 24.) Further, United argues that Laguana's failure to accommodate, constructive discharge, and wrongful termination claims independently fail on the merits. (*Id.* at 26–29.) Laguana conceded at the hearing that he had failed to administratively exhaust any wrongful termination claim.

The court grants summary judgment on Laguana's wrongful termination claim, as even Laguana himself recognizes that the claim fails for lack of administrative exhaustion. To the extent that the complaint alleges a "pattern or practice claim," the court grants summary judgment in favor of United because there is no evidence to support a "policy or practice of creating workplace chat groups that served to discriminate against individuals with disabilities . . . ." (*see* Compl. ¶ 39). The one chat group identified in this lawsuit is insufficient to demonstrate that United "widely discriminates against employees with disabilities" or that it "routinely discriminates" based on the creation of multiple workplace chat groups. *See Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003) (citing *Lyons v. England*, 307 F.3d 1092 (9th Cir. 2002)). Lastly, for the reasons discussed below, even assuming that Laguana has a "disability" within the meaning of the ADA, the court grants summary judgment on Laguana's failure to accommodate and constructive discharge claims.

### 1. The Court Proceeds by Assuming Laguana Has a "Disability" Within the Meaning of the ADA.

"To establish a prima facie case of discrimination, a plaintiff must show that: (1) he is a disabled person within the meaning of the ADA; (2) he is a qualified individual with a disability; and (3) he suffered adverse employment action because of his disability." *McDonald v. Molina Healthcare of Washington, Inc.*, No. 22-35108, 2023 WL 2387586, at *1 (9th Cir. 2023) (citing *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001)). United argues that Laguana fails to establish a *prima facie* case of disability discrimination under Title I of the ADA

because Laguana does not have a "disability" within the meaning of the ADA. (Mot. 24–25.)[5] The ADA defines a disability, in relevant part, as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102. District courts across the country have taken varying approaches to the question of whether individuals with asthma—when not experiencing asthmatic conditions at the time of the alleged discriminatory conduct—have a "disability" based on their vulnerability to serious illness or death by COVID-19 because of their pre-existing asthmatic condition. *Compare Tucker v. Wells Fargo Bank*, No. 1:21-CV-00735-LF-JMR, 2023 WL 2712534, at *4 (D.N.M. Mar. 30, 2023) *and Wragg v. Oritz*, 462 F. Supp. 3d 476, 513–14 (D.N.J. 2020), *with People First of Alabama v. Merrill*, 491 F. Supp. 3d 1076, 1157–58 (N.D. Ala. 2020) *and Peeples v. Clinical Support Options, Inc.*, 487 F. Supp. 3d 56, 62–63 (D. Mass. 2020). The Ninth Circuit has not spoken on the issue.

Laguana alleges that he has a respiratory disability: asthma. (Compl. ¶¶ 9, 36, 38, 48.) United argues that Laguana does not have a disability within the meaning of ADA because he admits that his asthma does not substantially limit his major life activities; his "medical leave was not due to his actual physical impairment, but rather his purported fear of contracting COVID-19 from passengers coming from 'hotspots' or 'epicenters' during the COVID-19 pandemic." (Mot. 24–25.) In response, Laguana argues that in the context of the COVID-19 Pandemic, individuals with asthma have a disability; further, Laguana argues that "whether or not Asthma constitutes a disability is a fact specific inquiry, often best left to a jury." (Opp'n 9–10.)

---

[5] United also states that Laguana cannot satisfy the third element of an ADA prima facie case—that Laguana suffered an adverse employment action because of his disability. (Mot. 24.) However, United only articulates this argument with respect to Laguana's wrongful termination claim. (*See id.* at 27–28.) Thus, the court does not consider United's argument—that Laguana has failed to establish the third element of an ADA prima facie case—with respect to Laguana's other ADA claims.

It is undisputed that Laguana was "not experiencing asthma conditions or COVID conditions" when he submitted his medical leave requests, "but [was] trying to avoid catching COVID." (Pl. Dep. Tr. 41; Laguana's Opp'n Stmt. ¶ 10.) In requesting documentation to support his medical leave request from Dr. Hughes, Laguana explained, "I am ok and carefully monitoring my existing Asthma conditions. . . I was just looking at different avenues of utilizing my hard earned FMLA hours in light of current pandemic [sic] and lack of consideration by our local management." (Pl. Dep. Tr. 39, 114; Laguana's Opp'n Stmt. ¶ 8.) As Laguana's medical leave continued into June 2020 and United requested additional medical supporting documentation, Laguana communicated with Dr. Hughes and explained, "[t]o reiterate Dr. Hughes, I am not comfortable putting myself at risk nor my families risk [sic] by even going to work because of the continued travel of passengers from 'Hotspot' not to mention possible 'epicenters' of COVID19." (Pl. Dep. Tr. 35, 40, 106; Laguana's Opp'n Stmt. ¶ 9.)

Given the conflicting authorities on the relevant question—whether an individual with asthma has a "disability" based on their vulnerability to COVID-19-related serious illness or death due to their asthmatic conditions—the court proceeds with its analysis by assuming, *arguendo*, that Laguana qualifies as an individual with a "disability" under the ADA. *See, e.g.*, *Menefield v. California Dep't of Corr. & Rehab.*, No. CV 23-3812-PA(E), 2023 WL 5596607, at *4 (C.D. Cal. Aug. 9, 2023), *report and recommendation adopted*, 2023 WL 5583921 (C.D. Cal. Aug. 29, 2023). Even so assuming, the court grants United's motion for summary judgment Laguana's remaining ADA claims.

### 2. The Court Grants Summary Judgment on Laguana's "Failure to Accommodate" Claims.

"The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the

operation of the employer's business." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)). United argues that Laguana's failure to accommodate claims cannot survive summary judgment because United indeed accommodated Laguana by approving his requests for medical leave; Laguana did not provide adequate notice to United of any other accommodations he might have sought; and the accommodations that United now believes Laguana desired are unreasonable as a matter of law. (Mot. 26–27.) In response, Laguana argues that apart from requests for leave, he sought accommodations related to his history of asthma in light of the COVID-19 Pandemic, such as "social distance and alternate job assignment away from the press of transiting passengers." (Opp'n 5, 8.) The court finds that neither Laguana's requests for leave nor his claimed COVID-19-related requests for accommodations can support a failure to accommodate claim.

### a. United Provided Reasonable Accommodations to Laguana by Approving His Medical Leave Requests and Granting Him Extended Illness Status.

It is undisputed that in May 2020, Laguana went on a two-and-a-half-year medical leave of absence until his employment with United ended in November 2022. (Laguana's Opp'n Stmt. ¶ 6.) Laguana further asserts that he was not paid by United beginning in July 2021 when he exhausted all his sick leave (Pl. Dep. Tr. 33; United's Reply Stmt. ¶ 21); United disputes this fact, arguing that Laguana did not exhaust his paid leave until September 2021[6] (United's Reply Stmt. ¶ 21). Both permitting the use of accrued paid leave and providing additional unpaid leave are forms of reasonable accommodations. 29 C.F.R. Part 1630, App. at § 1630.2(o) ("other accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment"); U.S. EQUAL EMP. OPPORTUNITY COMM'N, No. 915.002,

---

[6] The court reads the September 1, 2022 date alleged in United's Responsive Concise Statement of Facts (United's Reply Stmt. ¶ 21) to be a typographical error. The evidence that United cites to as support for its position, Laguana's EEOC charge, states that Laguana exhausted his leave on September 1, 2021. (Pl. Dep. Tr. 100.)

EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (2002) ("Permitting the use of accrued paid leave, or unpaid leave, is a form of reasonable accommodation when necessitated by an employee's disability."); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) ("Unpaid medical leave may be a reasonable accommodation under the ADA."). Thus, regardless of the date that Laguana exhausted his paid leave, United provided a reasonable accommodation to Laguana from May 2020 to the end of his employment with United by approving both his paid sick leave requests and Extended Illness Status for that two-and-a-half-year period.

> **b. None of Laguana's COVID-19 Related Accommodation Requests Can Support a Failure to Accommodate Claim.**

Although United provided a reasonable accommodation to Laguana by approving his paid sick leave and Extended Illness Status requests, United may still have held a duty to engage in an "interactive process" with Laguana regarding other accommodation requests if Laguana had adequately notified United. The court recognizes that employers are not required to provide the specific accommodation an employee requests or prefers; "the employer need only provide some reasonable accommodation." *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (internal quotations and citations omitted); 29 C.F.R. Part 1630, App. at § 1630.9 ("the employer providing the accommodation has the ultimate discretion to choose between effective accommodations"). However, while employers retain this flexibility to decide which reasonable accommodation to ultimately provide, employers must engage in an "interactive process" with employees whenever an employee notifies them of the need for an accommodation. *Snapp*, 889 F.3d at 1095. Through this interactive process, "the employer and employee can come to understand the employees' abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Id.* (citing

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111–16 (9th Cir. 2000) (en banc), *vacated on other grounds sub nom.*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 406 (2002). "[I]f an employer fails to engage in good faith in the interactive process, the burden at the summary-judgment phase shifts to the employer to prove the unavailability of a reasonable accommodation." *Id.* (internal citations omitted). The parties dispute whether Laguana provided adequate notice to United of his COVID-19-related accommodation requests. (*Compare* Laguana's Opp'n Stmt. ¶ 45, *with* United's Reply Stmt. ¶ 4.)

Viewing the facts in the light most favorable to Laguana, the court finds that United granted Laguana's COVID-19-related accommodation requests and there is no evidence of any failure to implement the accommodations because Laguana went on paid leave and stopped coming to work in April 2020; thus, none of his requests can support a failure to accommodate claim. Further, even if United had failed to appropriately respond to Laguana's COVID-19-related accommodation requests, any failure to accommodate claims would be time-barred because Laguana did not file his EEOC charge within 300 days of his COVID-19-related requests, which were made in April of 2020.[7] *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1); *cf. infra* § IV.B. (discussing and analyzing timeliness of Laguana's hostile work environment claims under ADA).

### i. Laguana's Request for Remote Work on STC Training Days

On April 8, 2020, Laguana emailed Tammy Castro, one of Laguana's managers, requesting to work from home on his designated Station Training Coordinator ("STC") training

---

[7] In his opposition, Laguana argued that equitable tolling should apply because he had initially attempted to file an administrative charge with the Guam Department of Labor ("GDOL") on May 20, 2021, but was informed by GDOL "that he should await corrective measures to be taken by his employer and that [GDOL] could not move along his EEOC complaint at that time." (Opp'n 13.) However, because Laguana was represented by counsel at the time of his interaction with GDOL, Laguana withdrew his argument for the application of equitable tolling at the hearing on the motion for summary judgment. *See Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010).

days. (Walsh Decl. 212, 251–52.) Although Laguana's Customer Service Representative position requires him to be physically present and assisting customers (Pl. Dep. Tr. 10–13, 16), Laguana's STC responsibilities can be performed remotely. (*Id.* at 16.) On April 14, 2020, Laguana emailed Justin Marion—his general manager—and Sam Shinohara—his regional managing director—stating that Castro never responded to his email requesting remote work. (Walsh Decl. 207, 211–12, 251.) On the same day, Castro and Laguana had a conversation during which Castro informed Laguana that his request to work remotely was approved. (*Id.* at 206, 208.) Laguana sent an email to United's Employee Advocacy Director Rahman Henderson on April 18, 2020, but he did not address whether he was notified of the approval of his remote work request by Castro. (*Id.* at 250–52.) That same month, Laguana went on paid leave. (Pl. Dep. Tr. 31, 33.) On or before May 2, 2020, Justin Marion, Laguana's General Manager, had attempted to contact Laguana about the concerns he had communicated to Henderson. (Walsh Decl. 253.) Laguana "respectfully[] declin[ed]" and "dodg[ed]" Marion's attempts to reach out. (*Id.*) After Laguana communicated this to Henderson, Henderson explained that Marion was likely reaching out to help resolve Laguana's concerns and encouraged Laguana to meet with Marion "as soon as possible." (*Id.*)

Based on these facts, the record supports a finding that Laguana's request for remote work on his STC training days was approved. There is no evidence demonstrating whether this accommodation was actually implemented, but Laguana stopped coming into work in April and instead relied on his paid leave. Therefore, Laguana's request for remote work on his STC training days cannot support a failure to accommodate claim against United.

### ii. Laguana's Request for Social Distancing

A day after Laguana requested to work from home on his STC work days, on April 9, 2020, Laguana requested to move the location of an operational briefing so that employees could

socially distance themselves from one another. (*Id.* at 209, 219.) Based on Laguana's own statement to United investigators, after he voiced his concern, the meeting location was changed to a conference room where employees could socially distance themselves. (*Id.* at 219.) Laguana claims that he made it clear to his supervisors that he needed the accommodation of social distancing (Opp'n 5), but no facts in the record demonstrate that he made any other requests for social distancing, or that those requests were denied. (*See* Walsh Decl. 220 (report indicating Laguana could not provide examples to United investigators of United management failing to follow safety guidelines).) Accordingly, given that Laguana's request for social distancing on April 9, 2020 was granted, and there is no evidence that Laguana made any additional requests for social distancing, Laguana's alleged requests for social distancing cannot support a failure to accommodate claim against United.

### iii. Laguana's Request for Temperature Checks

On April 17, 2020, Laguana called Jean Babauta, his supervisor, inquiring about whether United was conducting temperature checks in light of a United employee testing positive for COVID-19. (*Id.* at 214.) Babauta inquired about United's temperature check policies, and was informed that United does not perform additional temperature checks other than what is conducted at the TSA checkpoint. (*Id.*) Babauta attempted to call Laguana back several times to inform him of this information, but ultimately informed another agent as Laguana was not available to speak with her. (*Id.* at 214–15.) In April 2020, Laguana went on paid leave and stopped coming to work. (Pl. Dep. Tr. 31, 33.) In September/October 2020, Laguana discovered the WhatsApp group chat. (Walsh Decl. 195.) The group chat includes messages sent on April 23, 2020, wherein group chat members were apparently reacting to statements Laguana was making "on line"—individuals described that Laguana wanted United employees' temperatures taken. (Manibusan Dep. Tr. 36–37.) Based on an interview statement given by Castro, United

followed CDC Guidelines and implemented temperature check measures by no later than October 19, 2020. (Walsh Decl. 209, 220.) Laguana claims to have been denied an accommodation in the form of temperature checks, but the evidence demonstrates that United relied initially on the temperature checks conducted by TSA, and subsequently implemented its own temperature checks; but Laguana did not avail himself of the change because he stopped coming to work. Thus, his calls for temperature checks cannot support a failure to accommodate claim against United.

### c. Laguana Did Not Request a Different Accommodation when He Exhausted His Paid Leave.

At the hearing on this instant motion, Laguana argued that in September 2021,[8] Laguana exhausted his paid leave and at that point sought a different accommodation. However, Laguana also noted that he could not point to anything in the record demonstrating that he made such a request. Thus, Laguana's exhaustion of paid leave in September 2021—without evidence that Laguana requested a different accommodation—cannot support a failure to accommodate claim. *See Souza v. Silva*, Civil No. 12-00462 HG-BMK, 2014 WL 2452579, at *9 (D. Haw. May 30, 2014) (quoting *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1153 (9th Cir. 1997)) (citing 29 C.F.R. Part 1630, App. at § 1630.9) (generally, it is responsibility of individual to inform employer that accommodation is needed). United describes that Laguana desired accommodations in the form of "indefinite paid leave or the termination of a 'chunk' of his co-workers (up to twenty-five)." (Mot. 27.) To the extent that Laguana desired those accommodations, the court agrees with United that those accommodations are unreasonable as

---

[8] Although Laguana's concise statement of material facts represents that Laguana exhausted his paid leave in July 2021 (Laguana's Opp'n Stmt. ¶ 24; United's Reply Stmt. ¶ 21), in Laguana's opposition and at the hearing on the motion for summary judgment, Laguana relies on September 2021 as the month that he exhausted his paid leave (*see, e.g.*, Opp'n 14). The court proceeds based on the representation that Laguana exhausted his paid leave in September 2021, as also recognized by United (United Reply Stmt. ¶ 21), but notes that its analysis would apply equally if Laguana actually exhausted his paid leave in July 2021.

a matter of law. *See* U.S. EQUAL EMP. OPPORTUNITY COMM'N, No. 915.002, EEOC ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT (2002) ("An employer does not have to provide paid leave beyond that which is provided to similarly-situated employees."); *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000) ("Employers are not required to . . . displace existing employees from their positions . . . in order to accommodate a disabled individual.").

In summary, because the record undisputedly shows that Laguana's claimed accommodation requests were either not made or approved, none of his requests can provide the basis of a failure to accommodate claim. The court grants summary judgment in favor of United on Laguana's failure to accommodate claims.

### 3. Summary Judgment on Laguana's Constructive Discharge Claim Is Appropriate Because Laguana Did Not Resign.

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (internal quotations and citation omitted); *Atwood v. Consol. Elec. Distribs., Inc.*, 231 F. App'x 767, 769 (9th Cir. 2007) (considering constructive discharge claim in an ADA and age discrimination case). A constructive discharge claim has two elements: 1) "[a] plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and 2) the plaintiff must show that he "actually resigned." *Green*, 578 U.S. at 555. United argues that Laguana's constructive discharge claim fails as a matter of law because 1) no reasonable fact finder can find that United discriminated against Laguana to the point where a reasonable person would have felt compelled to resign, and 2) Laguana "did not resign from

United, did not attempt to resign, and was still employed by United when United terminated him." (Mot. 28–29.)

Without deciding the first element, the court grants summary judgment on Laguana's constructive discharge claim because Laguana has failed to establish the second element of a constructive discharge claim. Laguana does not dispute that he did not resign from United, did not attempt to resign, and was still employed by United when United terminated him. (Pl. Dep. Tr. 23; Laguana's Opp'n Stmt. ¶ 47.) However, during the hearing, Laguana articulated for the first time that his exhaustion of paid leave is the basis for his constructive discharge claim and cited to *Martinez v. Costco Wholesale Corp.*, 481 F. Supp. 3d 1076 (S.D. Cal. 2020) as support.

In *Martinez*, the district court denied summary judgment for an employer on an employee's constructive discharge claim brought under California's Fair Employment and Housing Act ("FEHA") when the employee demonstrated that she went on unpaid medical leave after experiencing months of discrimination and had given notice of her resignation. *Id.* at 1095, 1097–98. In so finding, the *Martinez* court cited to other federal court decisions acknowledging that employees may successfully bring constructive discharge claims under various legal authorities when the employee had not formally resigned, but had "suffered a forced unpaid medical leave of absence." *See White v. Honeywell, Inc.*, 141 F.3d 1270, 1279 (8th Cir. 1998) (constructive discharge claim under Title VII); *Violan v. On Lok Senior Health Servs.*, No. 12-CV-05739 WHO, 2013 WL 6907153, at *13 (N.D. Cal. Dec. 13, 2013) (constructive discharge claim under California common law); *Siraj v. Bayer Healthcare LLC*, No. 09-00233, 2010 WL 889996, at *7 (N.D. Cal. Mar. 8, 2010) (constructive discharge claim under FEHA); *Llewellyn v. Celanese Corp.*, 693 F. Supp. 369, 381 (W.D.N.C. 1988) (constructive discharge claim under Title VII). All of these cases predate the Supreme Court's decision in *Green v. Brennan*. *Martinez* is the only post-*Green* decision, but again, addressed an employee's constructive

discharge claim brought under California law—the FEHA. 481 F. Supp. 3d at 1096. Further, in *Martinez*, the employee had actually resigned. *Id.* at 1083.

In light of what this Court views as a clear requirement articulated by the Supreme Court that employees must have "actually resigned" in order to bring a successful constructive discharge claim under federal civil rights laws, *see Green*, 578 U.S. at 555, the court finds that Laguana's constructive discharge claim fails as a matter of law. *See e.g.*, *Oldham v. Div. of State Police*, Civ. A. No. 21-801-RGA, 2024 WL 2260361, at *3, 13 (D. Del. May 17, 2024) (finding plaintiff's constructive discharge claim brought under Title VII and Delaware Discrimination in Employment Act failed as matter of law when plaintiff was allegedly forced on medical leave, did not voluntarily resign, and was ultimately discharged).

**B. Summary Judgment on Laguana's Hostile Work Environment Claims (Count Four) Is Appropriate Because These Claims Are Untimely.**

In his complaint, Laguana alleges that he "suffered from unwelcome harassment in the form of homophobic and insulting comments" and that "harassment was also based on his disability and his request for accommodation." (Compl. ¶¶ 55–56.) United moves for summary judgment on Laguana's hostile work environment claims because 1) they are untimely (Mot. 21–22) and 2) they fail on the merits (*id.* at 29–31). Because Laguana's hostile work environment claims are time-barred, the court grants summary judgment on these claims.

Title VII's enforcement procedures govern the timeliness requirements for Laguana's hostile work environment claims, whether based on disability or sex. *See* 42 U.S.C. § 12117(a). Title VII's procedures provide, in relevant part:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place, and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief

from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 2000e-5(e)(1).

In order for a hostile work environment charge to be timely, "the employee need only file a charge within . . . [300 days[9]] of any act that is part of the hostile work environment." *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)). This is known as the continuing violations doctrine. *See id.* Acts must be discriminatory in order to constitute continuing violations. *Wadas v. Delta Air Lines, Inc.*, Civ. No. 18-00312 LEK-KJM, 2020 WL 7700583, at *18 (D. Haw. Dec. 28, 2020); *see Porter v. California Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Further, continuing violations must be part of the same hostile work environment—"one unlawful employment practice." *See Morgan*, 536 U.S. at 118. In conducting this analysis, the Ninth Circuit considers whether the events amounted to "the same type of employment actions, occurred relatively frequently, or were perpetrated by the same managers." *Porter*, 419 F.3d at 893 (quoting *Morgan*, 536 U.S. at 116, 120) (internal marks omitted).

United maintains that Laguana's "hostile work environment claims accrued no later than September/October 2020," as his claims "are based on his discovery of offensive WhatsApp chat messages around September/October 2020." (Mot. 13–14.) In response, Laguana recognizes that the WhatsApp Chat is "at the heart" of his hostile work environment claim (Opp'n 12), but argues

---

[9] United and Laguana agree that three hundred (300) days is the applicable limitations period here. (*See* Mot. 13; Opp'n 12.)

that the "hostile environment he was confronted with was not limited to his discovery of the chat" (Laguana's Opp'n Stmt. ¶ 39)—"the issue was continuing" (Opp'n 12). Laguana specifically draws attention to two dates as relevant, timely instances of discrimination: May 5, 2021 and September 1, 2021. (*Id.* at 12–13.) Laguana claims that both acts of discrimination occurred within 300 days of the filing of his charge with the EEOC on February 19, 2022.[10] (*Id.*) Although both dates fall within the 300-day statute of limitations, as the court details below, neither of these instances constitutes a continuing violation.

### 1. No Continuing Violation Occurred on May 5, 2021 Because No Discriminatory Act Occurred.

Laguana alleges that May 5, 2021 is an instance of a continuing violation because it is "the date that United refused to provide Mr. Laguana with information on its investigation into the harassment he faced." (*Id.* at 12–13.) The record demonstrates that on May 5, 2021, Robin Murdoch emailed Laguana regarding the completion of United's investigation of the WhatsApp group chat and informed him that violations of United workplace policies had occurred. (Walsh Decl. 201.) Further, the email communicated, "[d]ue to confidentiality, United is unable to share any details regarding correction action that may occur. . . If you have any questions or concerns regarding confidentiality, retaliation, or any other matter regarding this investigation, please contact me immediately." (*Id.*) During her deposition, Murdoch repeatedly stated it is "against company policy" to tell aggrieved employees about corrective actions that are taken against other employees. (*Id.* at 88–100.) Based on these facts, nothing discriminatory occurred on May 5, 2021. United's refusal to provide Laguana with additional information about its investigation was a matter of company policy. Nothing suggests that this refusal was based on Laguana's

---

[10] As addressed earlier in this decision, Laguana withdrew his argument for the application of equitable tolling. *See supra* note 6.

membership in a protected class. Thus, no continuing violation occurred on May 5, 2021.[11] *See*

*Porter*, 419 F.3d at 893.

### 2. No Continuing Violation Occurred on September 1, 2021 Because United's Alleged Failure to Take Appropriate Corrective Measures Is Not the Same Employment Practice As the WhatsApp Chat.

Laguana also alleges that September 1, 2021, the date that Laguana exhausted his paid

leave, is an instance of a continuing violation. (Opp'n 13.) At the hearing, Laguana articulated

that the September 1, 2021 date is relevant because Laguana exhausted his paid leave on account

of United's failure to take appropriate corrective action by that point.

United's alleged failure to take appropriate corrective measures is not a continuing

violation because, even if sufficiently proven, United's failure would not constitute the same

unlawful employment practice as the harassment perpetrated in the WhatsApp group chat. In

analyzing whether various acts constitute "one unlawful employment practice," Ninth Circuit

courts consider whether the events amounted to "the same type of employment actions, occurred

relatively frequently or were perpetrated by the same managers." *Porter*, 419 F.3d at 893

(quoting *Morgan*, 536 U.S. at 116) (internal marks omitted). Here, the WhatsApp chat involved

harassing messages from a group that included United employees. Laguana has not alleged and

there is no evidence in the record to support that these same United employees have exchanged

harassing messages about him after his discovery of the WhatsApp chat in September/October

2020. Next, there is no occurrence of "relatively frequent[]" employment actions; Laguana is

alleging that United's *inaction* is the problem. Lastly, the United employees who allegedly

---

[11] Laguana has voiced the following concern about United's company policy: if a harassed employee is not informed of the corrective actions taken against their harasser, how can they be sure that the hostile work environment has been remedied? In the case of a harassed employee who has taken leave because of the harassment, the harassed employee can return to work and see for themselves what remedial action the employer has taken and whether the action is sufficient. *See Chung v. City & Cnty. of Honolulu*, No. CV 14-00314 DKW-BMK, 2016 WL 335849, at *2, 4 (D. Haw. Jan. 27, 2016) (finding plaintiff's hostile work environment accrued no later than last time plaintiff "was physically at work"), *aff'd*, 728 F. App'x 766 (9th Cir. 2018).

participated in the harassing WhatsApp group chat—Ellie Sandlin, John Taitague, Jean Babauta, Tammy Castro, Stuart Suarez, Jean Wai, Lea Giminez, Jay Leon Guerrero, Renee Concepcion, Bernice Blas, and Mina Manibusan (Marion Decl. 2–3)—were not those involved in the subsequent investigation of the chat or the decision-making around appropriate disciplinary actions (*see* Murdoch Decl. at 2; Marion Decl. at 1–3). Thus, even if a genuine issue of fact exists as to whether United took appropriate corrective measures, the September 1, 2021 date would not constitute a continuing violation of Laguana's hostile work environment claim brought on the basis of the WhatsApp group chat and Laguana's discovery of the chat.

In summary, Laguana's hostile work environment claims are time-barred. No continuing violations occurred on May 5, 2021 or September 1, 2021. At the very latest, Laguana's hostile work environment claim accrued in September/October 2020, when he discovered the WhatsApp group chat. *See Chung v. City & Cnty. of Honolulu*, No. CV 14-00314 DKW-BMK, 2016 WL 335849, at *2, 4 (D. Haw. Jan. 27, 2016) (finding plaintiff's hostile work environment claim accrued no later than last time plaintiff "was physically at work," when plaintiff was on paid leave and subsequently leave of absence without pay), *aff'd*, 728 F. App'x 766 (9th Cir. 2018).

## V.      CONCLUSION

Laguana has failed to establish genuine issues of material facts with respect to his ADA and hostile work environment claims. Accordingly, the court GRANTS United's motion for summary judgment on the remaining two counts. Having granted United's motion for summary judgment as to all of Laguana's four legal claims—Counts One through Four of the complaint, the court directs the Clerk to enter judgment in favor of United and to close this case.

IT IS SO ORDERED this 30th day of May, 2025.

RAMONA V. MANGLONA
Designated Judge